No. 15-2118

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JO HUSKEY and ALLEN HUSKEY,

*Plaintiffs-Appellees*,

v.

ETHICON, INC. and JOHNSON & JOHNSON,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of West Virginia

## BRIEF OF APPELLANTS JOHNSON & JOHNSON
## AND ETHICON, INC.

CHARLES C. LIFLAND            STEPHEN D. BRODY
O'MELVENY & MYERS LLP         DAVID K. ROBERTS
400 South Hope Street         O'MELVENY & MYERS LLP
18th Floor                    1625 Eye Street, NW
Los Angeles, California 90071 Washington, D.C. 20006
(213) 430-6000                (202) 383-5300

*Counsel for Defendants-Appellants Johnson & Johnson and Ethicon, Inc.*

*[Additional counsel listed on inside cover]*

February 3, 2016

DAVID B. THOMAS
PHILIP J. COMBS
THOMAS COMBS & SPANN, PLLC
Post Office Box 3824
Charleston, West Virginia 25338
(304) 414-1800

CHRISTY D. JONES
BUTLER SNOW LLP
1020 Highland Colony Parkway
Suite 1400
Ridgeland, Mississippi 39157
(601) 985-4523

*Counsel for Defendants-Appellants Johnson & Johnson and Ethicon, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-2118__    Caption: _Huskey et al. v. Ethicon, Inc. et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Ethicon, Inc._____
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                        ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:
      Ethicon, Inc. is a wholly-owned subsidiary of appellant Johnson & Johnson. Ethicon has no
      grandparent or great-grandparent corporations.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                           ☐ YES ☑ NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ Charles C. Lifland_____    Date: _____2/3/2016_____

Counsel for: _Ethicon, Inc._____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____2/3/2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_/s/ Charles C. Lifland_____                    _____2/3/2016_____
(signature)                                                              (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-2118__    Caption: __Huskey et al. v. Ethicon, Inc. et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Johnson & Johnson_____
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☑ YES ☐ NO


2.    Does party/amicus have any parent corporations?            ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                               ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Charles C. Lifland          Date:     2/3/2016

Counsel for: Johnson & Johnson

## CERTIFICATE OF SERVICE
**************************

I certify that on _____2/3/2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Charles C. Lifland                              2/3/2016
_____(signature)_____                    _____(date)_____

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES ..............................................................1

PRELIMINARY STATEMENT................................................................3

STATEMENT OF THE CASE AND FACTS .......................................5

    A.    The TVT-O Surgical Device for Stress Urinary
          Incontinence ..................................................................5

    B.    Mrs. Huskey's Serious and Worsening SUI ................11

    C.    Mrs. Huskey's Treatment................................................12

    D.    Pretrial Proceedings and Evidentiary Rulings.................15

    E.    Trial ..............................................................................16

    F.    Post-Trial Rulings .........................................................18

SUMMARY OF ARGUMENT ..............................................................18

STANDARDS OF REVIEW ..................................................................22

ARGUMENT ...........................................................................................23

I.    Defendants Are Entitled to Judgment on the Inadequate-
    Warning Claim. ...............................................................................23

    A.    Dr. Byrkit's Testimony Precludes Plaintiffs' Warning
          Claim. ...........................................................................25

          1.    Mrs. Huskey Did Not Experience the Complications
              Allegedly Justifying Plaintiffs' Proposed
              Contraindication.................................................26

          2.    The Record Does Not Support Plaintiffs' Proposed
              Contraindication.................................................27

          3.    The Record Does Not Support Plaintiffs'
              Hypothetical Questioning....................................30

    B.    Ethicon Adequately Warned of Every Complication Mrs.
          Huskey Sustained and Dr. Byrkit Did Not Rely on
          TVT-O's IFU. ................................................................32

# TABLE OF CONTENTS
(continued)

Page

II. Defendants Are Entitled to Judgment on Plaintiffs' Design-Defect Claim. ..............................................................36

    A. The District Court Erroneously Failed to Apply Comment k. ...............................................................37

    B. TVT-O Comes Within Comment k's Protection. ........................44

    C. Plaintiffs Failed to Prove that a Specific Defect in TVT-O Caused Mrs. Huskey's Injuries. ...................................48

III. Defendants Are Entitled to Judgment on Plaintiffs' Negligence Claim and Mr. Huskey's Loss-of-Consortium Claim. .........................50

IV. At a Minimum, the District Court's Errors Require a New Trial. .......51

    A. The District Court Erroneously Excluded All FDA Evidence. .........................................................52

        1. Defendants' FDA Evidence Was Highly Probative. ........52

        2. The District Court's Erroneous Rulings Severely Prejudiced Defendants and a New Trial is Warranted. .................................................61

    B. At the Least, the District Court's Refusal to Instruct the Jury on Comment k Entitles Defendants to a New Trial. ..........66

CONCLUSION ..........................................................69

REQUEST FOR ORAL ARGUMENT ...............................................71

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ackley v. Wyeth Labs.,*
   919 F.2d 397 (6th Cir. 1990) ...................................................51

*Apperson v. E.I. du Pont de Nemours & Co.,*
   41 F.3d 1103 (7th Cir. 1994) ...............................................50

*Armentrout v. FMC Corp.,*
   842 P.2d 175 (Colo. 1992) ....................................................67

*Bitner v. Pekin Mem. Hosp.,*
   741 N.E.2d 1075 (Ill. App. 2000) .......................................51

*Boehm v. Eli Lilly & Co.,*
   747 F.3d 501 (8th Cir. 2014) ...............................................32

*Breen v. Synthes-Stratec, Inc.,*
   947 A.2d 383 (Conn. App. 2008) ........................................68

*Broussard v. Houdaille Indus., Inc.,*
   539 N.E.2d 360 (Ill. App. 1989) .........................................23

*Brown v. Superior Court,*
   751 P.2d 470 (Cal. 1988) ......................................................41

*Buckman Co. v. Plaintiffs' Legal Comm.,*
   531 U.S. 341 (2001) ...............................................................55

*Burwell v. Am. Edwards Lab.,*
   574 N.E.2d 1094 (Ohio App. 1989) ...................................68

*Calles v. Scripto-Tokai Corp.,*
   864 N.E.2d 249 (Ill. 2007) ...................................................38

*Chambers v. G.D. Searle & Co.,*
   441 F. Supp. 377 (D. Md. 1975) .........................................45

*Cisson v. C.R. Bard, Inc.,*
   --- F.3d ----, 2016 WL 158814 (4th Cir. Jan. 14, 2016) ...........passim

*Cisson v. C.R. Bard, Inc.,*
   2013 WL 5700513 (S.D.W.Va. Oct. 18, 2013) .................26

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Combs v. Int'l Ins. Co.,*
354 F.3d 568 (6th Cir. 2004) ...............................................................43

*Coursen v. A.H. Robins Co.,*
764 F.2d 1329 (9th Cir. 1985) .............................................................45

*Davila v. Bodelson,*
704 P.2d 1119 (N.M. App. 1985) .........................................................68

*De Bouse v. Bayer AG,*
922 N.E.2d 309 (Ill. 2009) ............................................................ passim

*Deans v. CSX Transp. Inc.,*
216 F.3d 398 (4th Cir. 2000) ...............................................................65

*Ellis v. Int'l Playtex, Inc.,*
745 F.2d 292 (4th Cir. 1984) ...............................................................52

*Estates of Tobin by Tobin v. Smithkline Beecham Pharm.,*
164 F. Supp. 2d 1278 (D. Wy. 2001).....................................................68

*Fed. Exp. Corp. v. Holowecki,*
552 U.S. 389 (2008)..............................................................................56

*First Union Commercial Corp. v. GATX Capital Corp.,*
411 F.3d 551 (4th Cir. 2005) ...............................................................22

*Food and Drug Administration v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000)..............................................................................59

*Frankum v. Boston Scientific Corp.,*
2015 WL 1956298 (S.D.W.Va. Apr. 25, 2015) ..................................24

*Glassman v. Wyeth Labs., Inc.,*
606 N.E.2d 338 (Ill. App. 1992) .................................................... passim

*Grundberg v. Upjohn Co.,*
813 P.2d 89 (Utah 1991) ...................................................20, 41, 42

*Hand v. Krakowski,*
89 A.D.2d 650 (N.Y. App. 1982) .........................................................30

*Hansen v. Baxter Healthcare Corp.,*
764 N.E.2d 35 (Ill. 2002) ...............................................................23, 33

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Henry v. Panasonic Factory Automation Co.*,
  917 N.E.2d 1086 (Ill. App. 2009) ................................................49

*Hernandez v. Schering Corp.*,
  958 N.E.2d 447 (Ill. App. 2011) ................................................27

*In re Norplant Contraceptive Prods. Liab. Litig.*,
  1997 WL 81094 (E.D. Tex. Feb. 21, 1997) ................................27

*Insolia v. Philip Morris Inc.*,
  216 F.3d 596 (7th Cir. 2000) ................................................37

*Jablonski v. Ford Motor Co.*,
  955 N.E.2d 1138 (Ill. 2011) ................................................50, 51

*Jackson v. A-C Prod. Liab. Trust*,
  622 F. Supp. 2d 641 (N.D. Ohio 2009) ................................31

*Johnson & Johnson v. Batiste*,
  2015 WL 6751063 (Tex. App. Nov. 5, 2015) ................................50

*Kirk v. Michael Reese Hosp. & Med. Ctr.*,
  513 N.E.2d 387 (Ill. 1987) ................................................41

*Kokoyachuck v. Aeroquip Corp.*,
  526 N.E.2d 607 (Ill. App. 1988) ................................................48

*Konkel v. Bob Evans Farms Inc.*,
  165 F.3d 275 (4th Cir. 1999) ................................................22

*Kunnemann v. Janssen Pharmaceutica Prods., L.P.*,
  2008 WL 5101116 (N.D. Ill. Dec. 2, 2008) ................................47

*Laro v. Thoro-Matic Vacuum Sys., Inc.*,
  551 N.E.2d 390 (Ill. App. 1990) ................................................50

*Lewis v. Johnson & Johnson*,
  601 F. App'x 205 (4th Cir. 2015) ................................................passim

*Lohr v. Medtronic, Inc.*,
  56 F.3d 1335 (11th Cir. 1995) ................................................58, 59

*Martin v. Ortho Pharm. Corp.*,
  661 N.E.2d 352 (Ill. 1996) ................................................23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Mason v. Smithkline Beecham Corp.,*
2010 WL 2697173 (C.D. Ill. July 7, 2010)................................19, 26

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ........................................9, 54, 55, 58

*Mele v. Howmedica, Inc.,*
808 N.E.2d 1026 (Ill. App. 2004) ........................................67

*Mikolajczyk v. Ford Motor Co.,*
901 N.E.2d 329 (Ill. 2008) ........................................38, 40

*Mikus v. Norfolk and W. Ry. Co.,*
726 N.E.2d 95 (Ill. 2000) ........................................28

*Mills v. United States,*
764 F.2d 373 (5th Cir. 1985) ........................................27

*Mitcheson v. Harris,*
955 F.2d 235 (4th Cir. 1992) ........................................37

*Moehle v. Chrysler Motors Co.,*
443 N.E.2d 575 (Ill. 1982) ........................................65

*Morgan v. Foretich,*
846 F.2d 941 (4th Cir. 1988) ........................................61

*Musgrave v. Breg, Inc.,*
2011 WL 4620767 (S.D. Ohio Oct. 3, 2011) ........................................61

*Mut. Pharm. Co. v. Bartlett,*
133 S. Ct. 2466 (2013)........................................36

*N. Trust Co. v. Upjohn Co.,*
572 N.E.2d 1030 (Ill. App. 1991) ........................................19, 23, 27, 28

*Noel v. Artson,*
641 F.3d 580 (4th Cir. 2011) ........................................66, 67

*Novak v. United States,*
865 F.2d 718 (6th Cir. 1989) ........................................27, 28, 29

*Odom v. G.D. Searle & Co.,*
979 F.2d 1001 (4th Cir. 1992) ........................................passim

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Old Chief v. United States,*
519 U.S. 172 (1997) ...................................................................62

*Ortho Pharm. Corp. v. Heath,*
722 P.2d 410 (Colo. 1986) .........................................................67

*Osborn v. Irwin Mem. Blood Bank,*
5 Cal. App. 4th 234 (Cal. App. 1992) .......................................48

*Phillips v. U.S. Waco Corp.,*
516 N.E.2d 670 (Ill. App. 1987) ................................................51

*Pluto v. Searle Labs.,*
690 N.E.2d 619 (Ill. App. 1997) ................................................29

*Rhodes v. E.I. du Pont de Nemours Co.,*
636 F.3d 88 (4th Cir. 2011) ........................................................37

*Riegel v. Medtronic, Inc.,*
552 U.S. 312 (2008) ....................................................................56

*Rivera v. Wyeth-Ayerst Labs.,*
283 F.3d 315 (5th Cir. 2002) ......................................................27

*Sanchez v. Boston Scientific Corp.,*
38 F. Supp. 3d 727 (S.D.W.Va. 2014) ...............................19, 24

*Schultz v. Butcher,*
24 F.3d 626 (4th Cir. 1994) ........................................................62

*Schultz v. Hennessy Indus., Inc.,*
584 N.E.2d 235 (Ill. App. 1991) ................................................29

*Sloas v. CSX Transp. Inc.,*
616 F.3d 380 (4th Cir. 2010) ......................................................66

*Smith v. Eli Lilly & Co.,*
560 N.E.2d 324 (Ill. 1990) .........................................................24

*St. Paul Fire & Marine Ins. Co. v. Jacobson,*
48 F.3d 778 (4th Cir. 1995) ........................................................37

*Stanback v. Parke, Davis & Co.,*
657 F.2d 642 (4th Cir. 1981) ...............................................24, 25

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Strum v. Depuy Orthopaedics, Inc.,*
2013 WL 3184765 (Ill. Cir. Mar. 8, 2013) ...................................61, 62

*Talley v. Danek Med., Inc.,*
179 F.3d 154 (4th Cir. 1999) .................................................................56

*Tansy v. Dacomed Corp.,*
890 P.2d 881 (Okla. 1994)...............................................41, 44, 45, 68

*Tobin v. Astra Pharma. Prods., Inc.,*
993 F.2d 528 (6th Cir. 1993) ...............................................................68

*Transue v. Aesthetech Corp.,*
341 F.3d 911 (9th Cir. 2003) .........................................................42, 45

*Tyree v. Boston Scientific Corp.,*
2014 WL 5445769 (S.D.W.Va. Oct. 22, 2014) ...................................27

*United States v. Cherry,*
330 F.3d 658 (4th Cir. 2003) ...............................................................22

*United States v. Delfino,*
510 F.3d 468 (4th Cir. 2007) ...............................................................23

*United States v. Johnson,*
617 F.3d 286 (4th Cir. 2010) ...............................................................22

*United States v. Pegues,*
493 F. App'x 396 (4th Cir. 2012) ........................................................62

*United States v. Powers,*
59 F.3d 1460 (4th Cir. 1995) ...............................................................62

*United States v. Russell,*
971 F.2d 1098 (4th Cir. 1992) .............................................................22

*Westfield Ins. Co. v. Harris,*
134 F.3d 608 (4th Cir. 1998) ...............................................................61

*Wiedenbeck v. Searle,*
895 N.E.2d 1067 (Ill. App. 2008) .......................................................29

*Woodbury v. Janssen Pharmaceutica, Inc.,*
1997 WL 201571 (N.D. Ill. Apr. 10, 1997) ........................................47

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Woodill v. Parke Davis & Co.,*
  402 N.E.2d 194 (Ill. 1980) ...................................................41

*Wooten v. Johnson & Johnson Prods., Inc.,*
  635 F. Supp. 799 (N.D. Ill. 1986) .............................................33, 35

## Statutes

21 U.S.C. § 360(k)...........................................................................8

21 U.S.C. § 360c(a)(1) .............................................................10, 56, 63

21 U.S.C. § 360j(*l*)(1) ...............................................................57

21 U.S.C. § 360e(b)(1) ...............................................................58

28 U.S.C. § 1291...........................................................................1

28 U.S.C. § 1332...........................................................................1

28 U.S.C. § 1407...........................................................................1

## Regulations

47 Fed. Reg. 2810, 21 C.F.R. § 878.3300, Surgical mesh (Jan. 19, 1982)...10, 57

53 Fed. Reg. 23,856 (June 24, 1988) ...............................................10, 58

68 Fed. Reg. 32,983 (June 3, 2003) ...................................................58

## Other Authorities

2 Dan. B. Dobbs et al., *The Law of Torts* (2d ed. 2011)....................................26

FDA, Premarket Notification (510k) (Aug. 19, 2014)........................................9

Ralph F. Hall & Michelle Mercer, *Rethinking* Lohr: *Does "SE" Mean Safe
  and Effective, Substantially Equivalent, or Both?,*
  13 Minn. J.L. Sci. & Tech. (2012) ....................................................55

Restatement (Second) of Torts § 402A cmt. k .........................................passim

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 because Defendants Ethicon, Inc. and Johnson & Johnson (Defendants) are appealing a final judgment against them. The district court had jurisdiction under 28 U.S.C. §§ 1332 and 1407 because Defendants are citizens of New Jersey while Plaintiffs Jo and Allen Huskey (Plaintiffs) are citizens of Illinois, and the amount in controversy exceeds $75,000.

## STATEMENT OF THE ISSUES

1.    Did the district court err in denying Defendants' motions for judgment as a matter of law on Plaintiffs' failure-to-warn claim where there was no evidence that any alleged inadequacy in Ethicon's warnings for its TVT-O medical device caused Mrs. Huskey's injuries, and where Ethicon warned of every complication Mrs. Huskey allegedly suffered?

2.    Did the district court err in submitting Plaintiffs' strict-liability design-defect claim to the jury where:

     a.    Defendants established that TVT-O is a socially useful product with unavoidable risks within the meaning of comment k to the Restatement (Second) of Torts § 402A, and

- 1 -

b.    Plaintiffs failed to prove that a specific defect in the TVT-O medical device caused Mrs. Huskey's injuries?

3.    Did the district court err in denying Defendants' motions for judgment as a matter of law on Mrs. Huskey's negligence claim and Mr. Huskey's loss-of-consortium claim where Mrs. Huskey's strict-liability claims, which covered the same ground, failed as a matter of law?

4.    Did the district court err in denying Defendants' motion for a new trial where:

a.    the court's evidentiary ruling barring all mention of the federal Food and Drug Administration (FDA) in a product-liability trial involving an FDA-regulated medical device severely prejudiced Defendants' case, and

b.    the court refused to instruct the jury on comment k to the Restatement (Second) of Torts § 402A after Defendants at a minimum established a jury question on its applicability?

## PRELIMINARY STATEMENT

This product-liability case attacks TVT-O, a widely used medical device recognized to be the "gold standard" for treating stress urinary incontinence (SUI), a chronic condition afflicting thousands of women that causes involuntary leakage of urine during everyday activities like laughing, coughing, and sneezing. Backed by years of data demonstrating the device's safety and efficacy, professional surgical societies throughout the world endorse the device as the first-line surgical treatment for this often-debilitating condition. Not only that, the device comes with warnings of the potential complications alleged here, and the experienced gynecological surgeon who implanted the device well knew them. Indeed, the surgeon testified that if the same patient came to her tomorrow, she would prescribe the same device, because it is "the best thing that [she] could offer." JA2458, JA2476.[1]

These facts should have defeated liability as a matter of law. The surgeon's testimony precluded any liability for allegedly inadequate warnings. And under comment k to the Restatement (Second) of Torts

---

[1] Citations to "JA__" refer to the joint appendix.

§ 402A—the governing liability standard under Illinois law—there could be no liability for allegedly defective design. Yet the trial court allowed the case to go to the jury, which awarded millions of dollars. This Court should reverse and direct the entry of judgment for Defendants.

At a minimum, the Court should order a new trial. The trial court not only failed to apply comment k, but refused even to instruct the jury on it. Compounding its error, the court barred the jury from hearing evidence from, or even mention of, the FDA. This not only barred evidence that FDA cleared the device for sale, but also prevented the jury from learning that FDA had approved Prolene suture (the polymeric material used to make the device's mesh) as safe and effective under the agency's New Drug Application process, and then regulated it as a Class III device under the Medical Device Amendments (MDA) before ultimately reclassifying it as a Class II device based on its established safety record. Not only that, before clearing any Prolene mesh products, FDA had classified polymeric surgical mesh as safe and effective via review by three medical panels and a public hearing.

The district court's order also prevented the jury from learning that after a recent comprehensive review specifically designed to evaluate the

- 4 -

safety and effectiveness of midurethral mesh sling devices like TVT-O, FDA concluded that their safety and effectiveness is "well-established." JA1592. The district court's exclusionary ruling thus went far beyond the one addressed in *Cisson v. C.R. Bard, Inc.*, --- F.3d ----, 2016 WL 158814 (4th Cir. Jan. 14, 2016), where the Court upheld a decision to bar evidence that FDA cleared a different device designed to treat a different condition. On the record here, both the refusal to instruct on comment k and the blanket prohibition of FDA evidence were prejudicial errors requiring a new trial.

## STATEMENT OF THE CASE AND FACTS

### A.    The TVT-O Surgical Device for Stress Urinary Incontinence

TVT-O is a prescription-only medical device designed to eliminate or reduce SUI by supporting the mid-urethra with a strip of tension-free polypropylene surgical mesh. To place the mesh, the surgeon pulls the plastic sheath-covered tape into position through an incision in the vagina using two trocars (surgical needles). JA3461-67. Once placed, the plastic sheath is removed and only the mesh strip remains in the body. *Id.* The mesh is tension-free in that it is not tied or sutured to the pelvic structure, but instead held in place by the natural ingrowth of surrounding tissue.

Midurethral slings like TVT-O represented a revolutionary breakthrough in the treatment of SUI. Before their advent, the prevailing surgical procedures for treating SUI entailed major abdominal surgery under a general anesthetic. JA3453; *see also* JA2308-09, JA2317. One such procedure, called Burch colposuspension, required an incision across the entire abdomen and displacement of organs. It took more time, demanded more skill, and required more patient recovery days. JA3454-56, JA3468-69; *see* JA2703-05, JA2708-10, JA3342-43, JA3372-73. Midurethral slings were such an advance in treating SUI that hospitals now rarely teach the Burch procedure. JA3075. Another more-invasive treatment uses "autologous" or "pubovaginal" slings made from human fascia (tissue from the patient or a cadaver). But it too is major abdominal surgery, has the highest complication rate of any SUI treatment, and has not been recognized as a front-line treatment option. JA3032-35, JA3453, JA3456-61, JA3468-69, JA3486-88; *see also* JA3046.

Midurethral slings offer a minimally invasive and effective alternative that, due to their "acknowledged safety and efficacy," have "created an environment for a much larger number of women to have access to treatment." JA3512. Almost immediately after their introduction in 1998,

- 6 -

they became doctors' overwhelming choice to treat SUI. *See, e.g.*, JA2949.

Ninety-nine percent of physicians belonging to the American

Urogynecologic Society (AUGS), a leading medical society for pelvic

surgeons, use midurethral slings to treat SUI. *Id.* Premier physicians'

organizations endorse such slings as safe and effective,[2] and extensive

clinical data support that conclusion.[3] In fact, midurethral synthetic mesh

slings are the most studied of all devices for treatment of SUI (JA2307,

JA3495), the subject of over 2,000 articles and 100 randomized control trials,

JA2318, JA2327. Other clinical studies show the safety and efficacy of

midurethral slings for up to 17 years. *Id.*

---

[2] *See* JA4289 & JA4363-64 (American Urological Association); JA4290-93 (AUGS and the Society of Urodynamics, Female Pelvic Medicine & Urogenital Reconstruction (SUFU)); JA4294-4341 (National Institute for Health and Care Excellence (NICE)); JA4342-43 (International Urogynecological Association); *see also* JA2303-18, JA2962-75 (referencing the European Association of Urology and other organizations).

[3] *See, e.g.*, JA2298; JA2963 ("Extensive data exist to support the use of synthetic polypropylene mesh suburethral slings for the treatment of female [SUI], with minimal morbidity compared with alternative surgeries."); JA2307-07; JA3495-96 (midurethral slings are supported by "the highest level of scientific evidence in the peer reviewed scientific literature"); *see also* JA2327-33 (discussing leading clinical studies).

TVT-O, like other midurethral slings, is well accepted by the medical community and backed by robust clinical data. Preeminent physicians' organizations conclude that transobturator slings like TVT-O are "safe and effective" and the "gold standard" for SUI surgery. JA2309-10, JA3051; *see also* JA3521-22 (meta-analysis concluding transobturator slings are a "gold standard first-line surgical treatment for women with SUI"). And more than 60 peer-reviewed, randomized clinical trials, which physicians consider "the highest level of evidence," establish TVT-O's safety and efficacy. JA3495-96; *see also* JA3513-14 (TVT-O is supported by "high quality evidence of efficacy and safety"); JA2313-2315 (same). The district court thus recognized that the testimony "from all of the medical witnesses [was] that the use of the TVT-O by urologists and other qualified physicians for the treatment of stress urinary incontinence meets the standard of care." JA3309.

Ethicon first marketed and sold TVT-O in the United States in 2004, after FDA cleared the device under its Section 510(k) regulatory process. *See* 21 U.S.C. § 360(k). To obtain FDA clearance, Ethicon was required to demonstrate that TVT-O was "at least as safe and effective" as a "legally

marketed" predicate device[4]—here, TVT, which itself went through the FDA clearance process in 1997 and 1998. JA780-81. But the regulatory pathway to TVT-O's FDA clearance involved far more than a simple 510(k) submission. FDA undertook medical panel review before classifying surgical mesh devices, and clearance was not based merely on "whether the device is 'substantially equivalent to one that existed before 1976,'" the grandfathering test applied to the device at issue in *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996). *Cisson*, 2016 WL 158814, at *4 (quoting *Lohr*, 518 U.S. at 493-94).

Both TVT-O and TVT contain polymeric meshes made from knitted filaments of Prolene suture that FDA approved in 1969 as "safe and effective" under its rigorous New Drug Application process. JA772-75, JA781-82. After the passage of the MDA in 1976, FDA initially regulated Prolene suture as a Class III medical device, ultimately reclassifying it as a Class II device in 1990 based on its established safety record. JA1195-1219.

_____

[4] FDA, Premarket Notification (510k) (Aug. 19, 2014), *available at* http://www.fda.gov/medicaldevices/deviceregulationandguidance/how tomarketyourdevice/premarketsubmissions/premarketnotification510k/d efault.htm (last accessed January 29, 2016).

Millions of Prolene sutures have been implanted in humans since their introduction. JA2130-32.

When FDA in the 1980s then sought to determine the proper regulatory MDA classification for polymeric meshes (of which TVT-O is composed), three different FDA medical panels—orthopedics, plastic surgery, and gastroenterology/urology—evaluated their safety and effectiveness. The panels recommended that all polymeric mesh be placed in Class II, because it "has an established history of safe and effective use." 47 Fed. Reg. 2810, 21 C.F.R. § 878.3300, Surgical mesh (Jan. 19, 1982). FDA agreed, finding that "the biocompatibility of the materials now being used in these devices has been established through their successful use for a number of years," 53 Fed. Reg. 23,856, 23,861 (June 24, 1988), and placement in class II will "provide reasonable assurance of the safety and effectiveness of the device." 21 U.S.C. § 360c(a)(1)(B).

But the jury heard none of this evidence because the district court barred *all mention* of the FDA. *See* JA1651-57, JA3187. This prevented the jury not only from learning about FDA's regulatory classification and clearance decisions, but also from hearing about FDA's recent post-market determination that the devices in question are indeed safe and effective.

- 10 -

Specifically, after a comprehensive review of all data available at the time of the events here, FDA found in 2013 that "[t]he safety and effectiveness of multi-incision slings," including TVT-O, was "well-established in clinical trials that followed patients for up to one-year" and that "[l]onger follow-up data is available in the literature." JA1592; *see also* JA1531-32, JA1589. Under the blanket exclusion order, the jury heard none of this. Nor did the jury hear FDA's assessment that "all surgeries for SUI carry" risks, and that the risks associated with mesh slings are not unique to TVT-O. JA1592.

## B.    Mrs. Huskey's Serious and Worsening SUI

Mrs. Huskey began to experience SUI in 2008. JA2792. Over the next few years, this condition significantly impacted her life, causing what she described as "very disturbing" episodes and a "horrible feeling." JA2761-62. By early 2011, she chronically leaked urine while laughing, coughing, and even sneezing. JA2459.

In January 2011, Mrs. Huskey saw Dr. Gretchen Byrkit to discuss her worsening condition. During that consultation, Mrs. Huskey complained of SUI and pain after intercourse. JA2448, JA2459. After attempting unsuccessfully to address her SUI with pelvic strengthening exercises,

JA2792-93, Mrs. Huskey, in consultation with Dr. Byrkit, underwent corrective surgery using TVT-O.

### C.    Mrs. Huskey's Treatment

Dr. Byrkit was well aware that TVT-O, like all surgically implanted devices, has risks. She knew that these risks included dyspareunia (pain during sex), JA2444, mesh erosion into the vagina, JA2431, JA2436, JA2444, and infection, JA2431, and "that there were some patients who were not helped by the procedure and that they would need to have further work-up and treatment," including additional surgery to remove the mesh, JA2431, 2460-61. She also knew that patients like Mrs. Huskey could suffer from chronic pain ranging from mild to severe. JA2443-44, JA2454.

The TVT-O device comes with Instructions for Use (IFU) that provide information about the proper use of the device together with detailed warnings and a list of potential adverse reactions. JA4150-56. These included, among others, extrusion and erosion, inflammation, infection potentiation, urinary tract obstruction, bleeding, and transitory foreign body response. For her part, Dr. Byrkit could not recall the last time she reviewed TVT-O's IFU, JA2455, but stated that she "probably" read it years

before Mrs. Huskey's surgery when she first performed the procedure. JA2455-66; *see also* JA2457 ("You can't learn surgery from a piece of paper.").

Rather than look to the IFU, Dr. Byrkit keeps up with outcomes and potential complications through the medical literature, discussions with colleagues, and her own experience. JA2425, JA2433, JA2456-57. That experience is extensive. Dr. Byrkit has performed up to two TVT-O surgeries per month for years. JA2442-43. All three factors—experience, consultation with colleagues, and the medical literature—prompted her to prescribe TVT-O for Mrs. Huskey. *See* JA2443; *see also* JA2425, JA2433, JA2456-57.

Mrs. Huskey chose to follow Dr. Byrkit's recommendation after Dr. Byrkit informed her of TVT-O's benefits and risks. JA2445 (Dr. Byrkit "weigh[ed] all the risks [and] the potential benefits and complications when" counseling Mrs. Huskey). Dr. Byrkit testified, and contemporaneous medical records show, that she warned Mrs. Huskey of, *inter alia*, infection, erosion, and the "possible need for further surgery, possible need to remove the TVT." JA2431. While Dr. Byrkit could not recall whether she warned of dyspareunia specifically, JA2453, she was well aware of the risk, JA2444, and discussed with Mrs. Huskey the possibility that the mesh could erode,

- 13 -

which "implies that anything in the vagina then would be uncomfortable." JA2436. Dr. Byrkit also warned Mrs. Huskey about the risk of pain, although she could not remember the exact words she used. JA2454; *see* JA2443-44.

Dr. Byrkit performed the procedure on February 23, 2011. In a post-operative visit in March, Dr. Byrkit noticed a small erosion, although Mrs. Huskey had no erosion-related complaints at that time. JA2466-67. In June, Dr. Byrkit performed a revision surgery to cover the eroded mesh. JA2474.

Subsequently, after Mrs. Huskey saw a lawyer advertisement seeking mesh patients, Mrs. Huskey called Dr. Byrkit who referred her to Dr. Sohail Siddique. JA2807-08, JA2475. Dr. Siddique excised a portion of the mesh on November 18, 2011. JA2487. Mrs. Huskey last saw Dr. Siddique in August 2012. JA2505. He placed no restrictions on her activities and asked her to follow up in two to three months. *Id.* She did not. *Id.*

At her lawyers' direction, however, Mrs. Huskey has seen four different doctors since filing suit, including her experts Drs. Rosenzweig and Blaivas. JA2811-12. Mrs. Huskey now complains of pelvic pain and dyspareunia, which she contends is partly attributable to the mesh erosion.

- 14 -

JA2876-77 (chronic pelvic pain); JA2776, JA2850-51 (dyspareunia); JA2862-63 (erosion).

Despite Mrs. Huskey's claims here, Dr. Byrkit continues to endorse TVT-O as a safe and effective treatment for SUI, and stands by her decision to prescribe it to Mrs. Huskey. In fact, TVT-O is the *only* product Dr. Byrkit prescribes to treat SUI, and will "continue to use" it in the future. JA2457. For Mrs. Huskey, Dr. Byrkit was confident that TVT-O "was the best thing that [she] could offer." JA2458. Dr. Byrkit affirmed that if a patient like Mrs. Huskey presented to her office tomorrow, she would "use the TVT-O again." JA2476.

### D.    Pretrial Proceedings and Evidentiary Rulings

Mrs. Huskey and her husband filed suit directly in MDL No. 2327 in the Southern District of West Virginia. JA54-60. After the district court awarded Defendants partial summary judgment, four claims remained: strict-liability design defect and failure to warn; negligence; and Mr. Huskey's loss-of-consortium claim. JA1740-63; *see also* JA54-60.

Before trial, the district court granted Plaintiffs' motion to exclude evidence relating to FDA's 510(k) clearance process and the "lack of enforcement action by the FDA relative to the TVT-O product." JA352. The

court held that this evidence was irrelevant to any claims or defenses on the ground that the 510(k) process "does not relate to safety or efficacy," and also inadmissible under Rule 403. JA1654, JA1657. At trial, the district court enforced an all-out ban on anything relating to FDA, backed by the threat of "very large" sanctions if even a medical article bearing the letters "FDA" was "introduced by accident." JA3187.

### E.    Trial

Trial began in August 2014. In addition to her failure-to-warn claim, Plaintiffs alleged three defects in TVT's mesh: (1) it is "heavyweight" and "small-pored"; (2) it is too "stiff," because it is cut with a laser instead of a machine; and (3) it allegedly "degrades" once implanted. Plaintiffs called three experts in support of these theories. Scott Guelcher, an associate professor of chemical engineering, addressed the characteristics of mesh slings and material-engineering issues like mesh weight, pore size, and interaction with the body's chemical processes. Bruce Rosenzweig, a urogynecologist, opined that TVT mesh is unsuitable for permanent implantation to treat SUI. Finally, Jerry Blaivas testified about Mrs. Huskey's alleged injuries.

Defendants rebutted Plaintiffs' trial proof, establishing that TVT-O is a gold standard, first-line treatment option for SUI backed by the "highest level of evidence" supporting its safety and efficacy. JA3495-96. Defendants showed that, notwithstanding the risks identified by Plaintiffs—all of which were known to Dr. Byrkit and the medical community—physicians overwhelmingly continue to endorse the use of TVT-O because these risks are "acceptably low." JA2299, JA2969.

Defendants sought judgment under Rule 50(a) on all claims when Plaintiffs rested. JA3111. The district court declined to rule on the motion, except that it dismissed Plaintiffs' claim for punitive damages. JA3131-32. Toward the end of trial, the district court asked for additional briefing on the applicability of comment k to the Restatement (Second) of Torts § 402A to Plaintiffs' design-defect claim. JA3309. Although the parties disagreed on whether its conditions were satisfied, they agreed that under Illinois law,[5] comment k creates an affirmative defense to design-defect claims where a socially useful product has unavoidable risks.

---

[5] The district court held—and Defendants agree—that Illinois law applies to Plaintiffs' substantive claims. JA1744-45.

Defendants submitted a proposed jury instruction in support of their comment k defense. JA4054. Plaintiffs did not contend that Defendants' instruction incorrectly stated the law in any way, nor did the court so suggest. At the close of all evidence, Defendants again moved for judgment as a matter of law and the court again declined to rule. JA3783. Over Defendants' objection, the district court submitted the claims to the jury without the proposed instruction on comment k. JA3783-84.

The jury returned a verdict in Plaintiffs' favor, awarding $3,070,000 to Mrs. Huskey and $200,000 to Mr. Huskey. JA4056-58, JA4554.

## F.    Post-Trial Rulings

Defendants renewed their motion for judgment as a matter of law under Rule 50(b) and sought, in the alternative, a new trial under Rule 59. The court denied the motion. JA4555-85.

## SUMMARY OF ARGUMENT

Defendants are entitled to judgment, and the district court's ruling to the contrary was error. The court misapplied settled Illinois law, all the while hobbling Defendants' case with its blanket ban against FDA evidence.

Plaintiffs' burden on their inadequate-warning claim required them to prove both that TVT-O's warnings were inadequate and that an inadequacy

caused Mrs. Huskey's injuries. *See, e.g.*, *N. Trust Co. v. Upjohn Co.*, 572 N.E.2d 1030, 1037 (Ill. App. 1991). Under the learned-intermediary doctrine, Plaintiffs could prevail on this claim only if they proved that the warnings did not tell highly trained pelvic surgeons about risks they otherwise would not grasp and also that Dr. Byrkit would have made a different prescribing decision had she received an adequate warning. *See id.*; *Sanchez v. Boston Scientific Corp.*, 38 F. Supp. 3d 727, 732 (S.D.W.Va. 2014); *accord Lewis v. Johnson & Johnson*, 601 F. App'x 205, 208 (4th Cir. 2015); *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992). Plaintiffs could not do so. Dr. Byrkit stands by her decision to use TVT-O and testified that if a patient like Mrs. Huskey presented to her office tomorrow, she "would use the TVT-O again." JA2476.

Dr. Byrkit's testimony should have been dispositive, but the district court submitted the claim to the jury on the ground that Dr. Byrkit might have changed her prescribing decision had Ethicon said that TVT-O is contraindicated for "active" women. The court's reliance on this hypothetical contraindication was erroneous, because Mrs. Huskey never experienced the chronic leg or groin pain that Plaintiffs offered as a basis for such a warning. *See, e.g.*, *Mason v. Smithkline Beecham Corp.*, 2010 WL

- 19 -

2697173, at *5 n.3 (C.D. Ill. July 7, 2010) ("[A] warning is only inadequate if it fails to list risks or side effects *that do occur*." (emphasis added)). In addition, there is no competent evidence supporting Plaintiffs' hypothetical contraindication, and Plaintiffs' claim fails for the independent reason that Ethicon adequately warned of every complication Mrs. Huskey sustained.

The district court erroneously rejected Defendants' argument that comment k to the Restatement (Second) of Torts § 402A foreclosed Plaintiffs' design-defect claim. Although "[c]omment k … has been adopted in Illinois," *Glassman v. Wyeth Labs., Inc.*, 606 N.E.2d 338, 342 (Ill. App. 1992), the district court wrote comment k out of Illinois law. The court believed that "comment k is, in essence, nothing more than another name for the risk-utility test" used in design-defect cases involving ordinary consumer goods, and held it was free to cast comment k aside. JA4561.

But the point of comment k is that prescription-only products are different: "Despite inherent risks, *and in contrast to any other product*, society has determined that prescription [-only products] provide a unique benefit and so should be available to physicians with appropriate warnings and guidance as to use." *Grundberg v. Upjohn Co.*, 813 P.2d 89, 96 (Utah 1991) (emphasis in original). The district court's reading of Illinois law was not

only incoherent in holding that the only function of comment k was to flip the burden of proof on a plaintiff's claim to the defendant, JA4581, but also wrong. *Glassman*, 606 N.E.2d at 342-43 (applying comment k separately from the risk-utility test).

Properly applied, comment k barred Plaintiffs' claim. TVT-O is endorsed by physicians' organizations the world over who consider it the gold-standard treatment for the potentially devastating symptoms of SUI and conclude that its risks are "acceptably low." JA2299, JA2969. Tort law does not deprive trained physicians of the ability to use a product that all medical witnesses agreed "meets the standard of care." JA3309.

The district court nevertheless erroneously submitted Plaintiffs' claims to the jury, and when it did so, declined even to instruct the jury on comment k. This alone warrants a new trial. The court also deprived the jury of crucial information, excluding all FDA-related evidence. Unlike the ruling in *Cisson*, which concerned only evidence that the device at issue was cleared by FDA (and as to which this Court cabined its analysis within the distinguishable framework of *Lohr*), the ruling here barred Defendants from informing the jury that FDA specifically evaluated the safety and effectiveness of slings like TVT-O and found their safety and efficacy to be

"well-established." JA1592. It also prevented the jury from hearing that

FDA rejected the contention advanced here that Prolene, which comprises

TVT-O, tends to degrade. Thus in a case about a device the FDA has

extensively regulated, the jury was barred from even hearing the letters

"FDA." This critical evidentiary error prejudiced Defendants' case and

separately warrants a new trial.

## STANDARDS OF REVIEW

"The denial of a Rule 50(b) motion is reviewed *de novo.*" *First Union*

*Commercial Corp. v. GATX Capital Corp.*, 411 F.3d 551, 556 (4th Cir. 2005).

Such a motion should be granted where, even without weighing the

evidence or considering the credibility of witnesses, "substantial evidence

does not support the jury's findings." *Konkel v. Bob Evans Farms Inc.*, 165 F.3d

275, 279 (4th Cir. 1999).

A district court's evidentiary rulings are reviewed for abuse of

discretion. *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010). This

standard also governs the court's "decision to give (or not give) a jury

instruction and the content of an instruction," *United States v. Russell*, 971

F.2d 1098, 1107 (4th Cir. 1992), except that this Court "review[s] de novo [a]

claim that jury instructions fail to correctly state the law." *United States v.*

- 22 -

*Cherry*, 330 F.3d 658, 665 (4th Cir. 2003). A district court abuses its discretion where it acts irrationally or arbitrarily, where it "relies on erroneous factual or legal premises," or where it "commits an error of law." *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007).

## ARGUMENT

### I.    Defendants Are Entitled to Judgment on the Inadequate-Warning Claim.

To prevail on the inadequate-warning claim, Plaintiffs were required to prove that Defendants did not adequately warn of a risk and that the failure to do so proximately caused Mrs. Huskey's injuries. *See, e.g.*, *N. Trust*, 572 N.E.2d at 1037; *Broussard v. Houdaille Indus., Inc.*, 539 N.E.2d 360, 363 (Ill. App. 1989). Where, as here, the product at issue is a prescription-only medical device, the manufacturer's "duty to warn runs only to the prescribing physician, and not to [its] user." *Martin v. Ortho Pharm. Corp.*, 661 N.E.2d 352, 353 (Ill. 1996). "A corollary of [this] doctrine is the principle that a prescription medical device manufacturer need not provide a warning of risks already known to the medical community." *Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35, 42 (Ill. 2002).

"In order to satisfy the element of causation under the learned intermediary doctrine, a plaintiff must demonstrate that the prescribing physician would have acted differently had he or she received adequate warnings." *Sanchez*, 38 F. Supp. 3d at 732; *accord Lewis*, 601 F. App'x at 208; *Odom*, 979 F.2d at 1003-04; *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324, 343 (Ill. 1990) ("The concept that liability may be imposed based merely on a breach of duty, without causation being established, has long been rejected in American tort law."). Under this rule, there is no causal link where the physician did not read the materials that would have contained the warning, *Frankum v. Boston Scientific Corp.*, 2015 WL 1956298, at *4 (S.D.W.Va. Apr. 25, 2015); where the physician "read ... but ... did not *rely* on" those materials, *Lewis*, 601 F. App'x at 209 (emphasis in original); or where the physician would have made the same prescribing decision even if given an adequate warning, *Odom*, 979 F.2d at 1003-04; *Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 645-46 (4th Cir. 1981). Plaintiffs failed to carry their causation burden, and the district court should have entered judgment for Defendants.

- 24 -

## A.    Dr. Byrkit's Testimony Precludes Plaintiffs' Warning Claim.

Any alleged failure to warn could not have been the proximate cause of Mrs. Huskey's injuries because her implanting surgeon, Dr. Byrkit, testified unequivocally that if a patient like Mrs. Huskey presented to her office tomorrow, she "would use the TVT-O again." JA2476. In fact, TVT-O is the *only* product she uses to treat SUI, and Dr. Byrkit reaffirmed that she would continue to prescribe it even after Plaintiffs' counsel marched her through its alleged risks. JA2457; *see also* JA2458 (TVT-O "was the best thing that I could offer her"). This testimony forecloses any claim that Dr. Byrkit would have acted differently had she received an adequate warning. *E.g.*, *Odom*, 979 F.2d at 1003-04; *Stanback*, 657 F.2d at 645-46.

The district court nevertheless decided that Plaintiffs adduced sufficient evidence of causation based on Dr. Byrkit's response to a hypothetical question asking whether she would have prescribed TVT-O for Mrs. Huskey if Ethicon had said it was "contraindicated" for "active" women. The district court's ruling was erroneous, for multiple reasons.

- 25 -

### 1. Mrs. Huskey Did Not Experience the Complications Allegedly Justifying Plaintiffs' Proposed Contraindication.

First, the district court erred for the simple reason that the sole basis for Plaintiffs' contention that TVT-O should have carried a contraindication for "active" women was the supposed risk of chronic "thigh pain and groin pain" in that subpopulation. JA4571; *see also* JA2939. There was no evidence, however, that Mrs. Huskey experienced such pain. JA3509; *see also* JA3721 (Plaintiffs agreed that leg and groin pain is "not [Mrs. Huskey's] chronic complaint").

The lack of any connection between the supposedly inadequate warning and Mrs. Huskey's injuries precluded Plaintiffs from establishing causation. *See, e.g.*, *Cisson v. C.R. Bard, Inc.*, 2013 WL 5700513, at *6 (S.D.W.Va. Oct. 18, 2013) ("[T]he plaintiff must show that the failure to warn proximately caused his or her injuries. This necessarily means that the warning the plaintiff alleges should have been given would have addressed the plaintiff's injuries." (citing 2 Dan. B. Dobbs et al., *The Law of Torts* 972 (2d ed. 2011)); *Mason*, 2010 WL 2697173, at *5 n.3 ("[A] warning is only

inadequate if it fails to list risks or side effects *that do occur*." (emphasis added)).[6]

### 2. The Record Does Not Support Plaintiffs' Proposed Contraindication.

Plaintiffs' theory also fails because they presented no competent evidence supporting their hypothetical contraindication. Instead, they offered only the unsubstantiated *ipse dixit* of an expert who in any event proposed a much milder warning than the stark contraindication they hypothesized to Dr. Byrkit.

Only expert testimony can show the inadequacy of a warning in a case like this involving complex biomedical issues. *N. Trust*, 572 N.E.2d at 1036, *accord Hernandez v. Schering Corp.*, 958 N.E.2d 447, 455-56 (Ill. App. 2011). Whether there exists a sufficient "link" between a prescription medical product and an alleged condition, thus necessitating a warning, is

---

[6] *See also, e.g.*, *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 321 (5th Cir. 2002); *Novak v. United States*, 865 F.2d 718, 726 (6th Cir. 1989); *Mills v. United States*, 764 F.2d 373, 379 (5th Cir. 1985) ("The question of the adequacy of the warnings must be confined to consideration of whether the warnings were sufficient to inform the plaintiff of the risk of the particular condition or disease which allegedly caused his injury or death."); *In re Norplant Contraceptive Prods. Liab. Litig.*, 1997 WL 81094, at *1 (E.D. Tex. Feb. 21, 1997); *Tyree v. Boston Scientific Corp.*, 2014 WL 5445769, at *6 (S.D.W.Va. Oct. 22, 2014) ("[O]nly the injuries experienced by the complainant are relevant.").

"a complex question which require[s] expert testimony." *N. Trust*, 572 N.E.2d at 1036-37; *Novak*, 865 F.2d at 726 (rejecting inadequate-warning claim because "[t]here was no adequate admissible medical proof showing a causal relationship between" alleged adverse reactions and the pharmaceutical product). "A medical expert may offer an opinion on causation if the expert's opinion is based upon a reasonable degree of medical certainty and not based upon speculation or conjecture." *Mikus v. Norfolk and W. Ry. Co.*, 726 N.E.2d 95, 108 (Ill. 2000).

The only expert opinion Plaintiffs offered to support the idea that TVT-O should have contained a contraindication was Dr. Blaivas's offhand comment that "there's some evidence that in people that are that active, because of the propensity for causing groin and thigh pain, you might want to think of another kind of an operation." JA2939.[7] This testimony offers no refuge for Plaintiffs' claim.

---

[7] Dr. Rosenzweig did not testify that TVT-O should be contraindicated for active women. Rather, the district court *prohibited* him from offering that opinion before trial and then again during trial. JA2291-92 (referring to JA1686-87 and JA1818-19).

First, although Dr. Blaivas stated that "some evidence" supported his contention, he never identified it—indeed, no medical evidence exists on this record.[8] "An expert's opinion is only as valid as the reasons for" it, and "[w]hile testimony grounded in expert analysis of the known physical facts is welcomed, conclusory opinions based on sheer, unsubstantiated speculation should be considered irrelevant." *Wiedenbeck v. Searle*, 895 N.E.2d 1067, 1070 (Ill. App. 2008) (quotations omitted); *Schultz v. Hennessy Indus., Inc.*, 584 N.E.2d 235, 243 (Ill. App. 1991). Dr. Blaivas's unsubstantiated opinion was not sufficient to establish a contraindication. *See Pluto v. Searle Labs.*, 690 N.E.2d 619, 622 (Ill. App. 1997) (no duty to warn because proposed warning was not medically justified); *accord Novak*, 865 F.2d at 726 (rejecting inadequate-warning claim because "no medical

---

[8] The district court pointed to an informal note allegedly reflecting the thoughts of a doctor who once consulted for Ethicon about a possible successor product to TVT-O. JA4083. According to the note's author, the doctor hypothesized that "the presence of tape in the adductors" can contribute to pain, which was important for "sportive patients." *Id.* But this note was never subjected to and could not survive scrutiny under *Daubert*, and there is no clinical data that would transform this assertion into medical fact, thus making it unsurprising that Dr. Blaivas did not link his testimony in any way to this unverified hypothesis.

opinion identified any connection between 'viral encephalitis' and" the drug).

Second, and just as important, Dr. Blaivas never testified that TVT-O actually *is* contraindicated for "active" women—only that there existed some unspecified evidence that suggested that a physician "*might* want to *think of*" another treatment. *Cf. Hand v. Krakowski*, 89 A.D.2d 650, 651 (N.Y. App. 1982) ("A 'contraindication' refers to a circumstance under which the drug must never be given. It is absolute and admits of no exceptions." (quotations and alterations omitted)); *accord* JA2281 (Dr. Rosenzweig's definition of contraindication). Dr. Blaivas's testimony simply does not show that TVT-O was or should have been contraindicated for use in active women.

### 3. The Record Does Not Support Plaintiffs' Hypothetical Questioning.

Nor does Dr. Blaivas's testimony support the hypothetical posed to Dr. Byrkit. Plaintiffs asked Dr. Byrkit:

Q: If you had been told that [TVT-O] shouldn't be implanted in women who are active, actively exercising, fit women, if you had been told that it shouldn't be implanted in those women, would you still have implanted it in Jo Huskey?

A: I don't think I would.

JA2438. The hypothetical asked Dr. Byrkit to assume that TVT-O should *never* be implanted in active women, yet Dr. Blaivas's tepid opinion referred merely to "some evidence" that a doctor "might want to think" about a different treatment for active women. His testimony thus provides no support for the assumption that TVT-O "*shouldn't* be implanted in those women" under any circumstances. *See, e.g.*, *Jackson v. A-C Prod. Liab. Trust*, 622 F. Supp. 2d 641, 646-47 (N.D. Ohio 2009) (testimony "based on hypothetical questions unsupported by the evidence" could not support jury's verdict). And Plaintiffs adduced no evidence that an advisory telling physicians that they "might want to think about" alternative treatments in "active" patients would have changed Dr. Byrkit's decision to use TVT-O in Mrs. Huskey. Dr. Byrkit never testified that this mild advisory—a far cry from the "never use TVT-O in active women" contraindication she was asked about—would have had any effect on her prescribing decision.

Plaintiffs' proof is thus weaker than what this Court found wanting in *Odom*. There, the plaintiff's prescribing physician testified that, notwithstanding his patient's injuries, he "would still prescribe [the device] today." 979 F.2d at 1002. The plaintiff attempted to overcome this testimony by pointing to an expert's opinion that a proper warning would have

included a contraindication "flatly" stating that the device "was an inappropriate contraceptive device for women who might later want children." *Id*. at 1003. The Court held that the plaintiff could not prove causation "by arguing that a more drastic warning would have resulted in a different course of treatment" because the expert's hypothetical contraindication bore no "reasonable relation" to the product's risks and was "not justified by the evidence in this case." *Id*. at 1003-04; *accord Boehm v. Eli Lilly & Co.*, 747 F.3d 501, 506-08 (8th Cir. 2014) (plaintiff's physician's testimony that he would have changed his prescribing decision based on a hypothetical warning was insufficient to create jury question because plaintiff "had not provided sufficient scientific support for that" warning).

### B.    Ethicon Adequately Warned of Every Complication Mrs. Huskey Sustained and Dr. Byrkit Did Not Rely on TVT-O's IFU.

Even putting aside Dr. Byrkit's unequivocal testimony standing behind her decision to use TVT-O, Plaintiffs' inadequate-warning claim fails because Ethicon adequately warned of every risk Mrs. Huskey experienced. Mrs. Huskey complained of chronic pain and dyspareunia, due in part to mesh erosion. JA2876-77 (chronic pain); JA2776, JA2850-51 (dyspareunia); JA2862-63 (erosion). The record conclusively established that either

Defendants expressly warned of these risks, JA4156 (IFU warns of erosion), or the medical community was well aware of them, JA2443-44, JA2454 (chronic pain); JA2484, 2497-98 (same); JA2344, JA2436, JA2444, JA2453 (dyspareunia); JA3482-83 (all pelvic floor surgeries carry the risk of pain and dyspareunia). *See Hansen*, 764 N.E.2d at 42 (no duty to warn of risks known to medical community).

Plaintiffs' claim also fails because Dr. Byrkit was personally well aware of TVT-O's risks, independently of the IFU. Dr. Byrkit warned Mrs. Huskey—as she did all her patients—of the risks of infection, erosion, and the possible need for further surgery, including surgery to remove the TVT-O. JA2431. Dr. Byrkit understood that chronic pain was a possibility, JA2443-44, JA2454, and that TVT-O could cause dyspareunia, JA2444. Given Dr. Byrkit's full knowledge of the risks cited by Mrs. Huskey, Defendants are not liable for failure to warn. *See, e.g.*, *Wooten v. Johnson & Johnson Prods., Inc.*, 635 F. Supp. 799, 803 (N.D. Ill. 1986) ("Courts have held consistently that a drug manufacturer is entitled to summary judgment [on an inadequate-warning claim] where the prescribing physician is aware of the risks associated with a drug."); *Hansen*, 723 N.E. 2d at 42 (no duty to warn of risk already known by recipients).

The district court offered three reasons why it thought this evidence was not conclusive. Each falls wide of the mark. First, the district court stated that Dr. Byrkit had "no knowledge of contraindications for active patients." JA4573. But there is no basis for such a contraindication. *See supra* at 27-30. Second, the court reasoned that "Dr. Byrkit seemed unaware of any relationship between the amount of mesh material in the implant and the risk of complications." JA4573. That is inaccurate: Dr. Byrkit "expect[ed]" that very relationship. JA2440 ("I would expect potentially less mesh could result in less potential complication[s]."). In any case, the amount of mesh is a *design element*—not a *risk*—and neither the district court nor Plaintiffs identified a single case holding that a pharmaceutical manufacturer has a duty to warn that its product is defectively designed. Third, the district court asserted that Dr. Byrkit was unaware that "the mesh itself could cause infection." JA4573. But Dr. Byrkit was well aware that surgery with TVT-O carries a risk of infection. JA2431. Moreover, Plaintiffs' allegations about the alleged etiology of post-implant infection did not alter Dr. Byrkit's conviction that TVT-O is the appropriate treatment for patients like Mrs. Huskey. JA2457, JA2476.

Finally, Plaintiffs could not point to *any* testimony that TVT-O's IFU, or any other warning issued by Ethicon, influenced Dr. Byrkit's decision to prescribe TVT-O for Mrs. Huskey. Dr. Byrkit explained that her prescribing decisions are based on her "own experience" and "discussion[s] with colleagues." JA2443. She keeps informed of relevant developments, including risks, through these sources and the medical literature. JA2425, JA2433, JA2456-57. Dr. Byrkit could not remember the last time she read the IFU[9]—although she believed she probably read it "around the time [she first] started using" the device. JA2455-56. And there was no evidence that Dr. Byrkit consulted the IFU at any point after she began using TVT-O, let alone that she relied on it to learn of TVT-O's risks when prescribing the device for Mrs. Huskey. *See, e.g., Lewis*, 601 F. App'x at 208 (affirming judgment for Defendants even though plaintiff's prescribing physician testified that she had read the IFU during her fellowship, because she had not read it again before prescribing the device to the plaintiff); *Wooten*, 635 F. Supp. at 804 (awarding judgment to defendant because the prescribing

---

[9] Dr. Byrkit did not even know what the acronym "IFU" meant when asked if she read TVT-O's IFU. JA2433.

physician obtained "information sufficient to determine whether to prescribe [the drugs] from a variety of sources, only one of which was the package insert").

## II.    Defendants Are Entitled to Judgment on Plaintiffs' Design-Defect Claim.

Defendants are entitled to judgment on Plaintiffs' design-defect claim because comment k to the Restatement (Second) of Torts § 402A precluded a finding that TVT-O was either defectively designed or unreasonably dangerous. The district court's contrary holding rested on its conclusion that comment k plays no independent role in Illinois jurisprudence. But as in "a large majority of States," *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2476 n.2 (2013), comment k is a vital part of Illinois law. *See De Bouse v. Bayer AG*, 922 N.E.2d 309, 317 (Ill. 2009) ("This court has previously recognized section 402A of the Second Restatement of Torts and the exception found in comment k, including a recognition that prescription drugs may be 'unavoidably unsafe." (quotations omitted)); *Glassman*, 606 N.E.2d at 342 ("Comment k ... has been adopted in Illinois."). Had the district court simply applied this settled precedent, rather than rendering a novel and

highly problematic construction of Illinois law, it would have found that TVT-O falls well within the protection of comment k.

### A.    The District Court Erroneously Failed to Apply Comment k.

Federal courts sitting in diversity are bound to "ascertain and apply the law of a State as it exists." *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995); *see also Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000) ("Federal courts are loathe to fiddle around with state law."). This command applies even where the federal court believes state law to be a "useless relic," JA4561—a diversity court may not rework state law merely because it "appear[s] desirable." *Rhodes v. E.I. du Pont de Nemours Co.*, 636 F.3d 88, 96 (4th Cir. 2011). Instead, a diversity court must "respond conservatively," *id.*, and should not "render what may be an uncertain and ephemeral interpretation," *Mitcheson v. Harris*, 955 F.2d 235, 238 (4th Cir. 1992) (quotations omitted).

Illinois applies § 402A of the Restatement (Second) of Torts, under which a manufacturer may be held strictly liable for design defect if the product in question is "unreasonably dangerous." *Glassman*, 606 N.E.2d at

341. Under the otherwise-applicable risk-utility test,[10] Plaintiffs could show that TVT-O was unreasonably dangerous by demonstrating that "the magnitude of the danger outweighs the utility of the product, as designed." *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249, 257 (Ill. 2007). But "[c]omment k offers an exception to [this] general rule," *De Bouse*, 922 N.E.2d at 317, providing that a prescription drug or medical device is neither defective nor unreasonably dangerous on account of its design if that product, "in the present state of human knowledge, [is] quite incapable of being made safe for [its] intended and ordinary use." Restatement (Second) of Torts § 402A cmt. k.

"The seller of such [a] product[] ... is not to be held to strict liability for unfortunate consequences attending [its] use, merely because [it] has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." *Id.* Thus, comment k forecloses design-defect liability for products falling within its

---

[10] Where, as here, the evidence relates to both the consumer-expectations and the risk-utility tests, Illinois courts apply the latter test because it incorporates consumer expectations. *See Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 352-53 (Ill. 2008).

reach, while leaving open a plaintiff's ability to pursue failure-to-warn and manufacturing-defect claims against such products.

The district court refused to apply comment k, reasoning that because comment k is "nothing more than another name for the risk-utility test," and because Illinois's general approach to design-defect claims utilizes such a test, comment k was a "useless" redundancy that it was free to disregard. JA4561. It thus concluded that Defendants could be liable with no account for whether TVT-O was "apparently useful and desirable" despite unavoidable risks.

This was a gross misconstruction of Illinois law. Illinois applies a "case-by-case" approach to comment k that requires determination of whether comment k is satisfied in the first instance. *Glassman*, 606 N.E.2d at 342-43. Only if comment k is not satisfied does the jury consider whether the product is unreasonably dangerous under the risk-utility test. *Id.* The test of whether comment k applies does not reflect the same considerations embodied by the general risk-utility test. The unique considerations posed

by prescription-only products call for a different calculus than that for a "knife" or a "fondue pot." JA4580.[11]

Unlike ordinary consumer goods, prescription drugs and devices carry with them *unavoidable* risks. Even when properly used, they present a non-negligible and sometimes serious risk of injury. *See De Bouse*, 922 N.E.2d at 318 ("[Comment k] reflects the reality that even in their intended and ordinary use, prescription drugs may nonetheless cause harmful side effects in some patients. A drug manufacturer cannot say with complete certainty that its product, when used as intended, will be reasonably safe for all patients.").

It is "for this very reason" that prescription-only medical devices—unlike knives and fondue pots—"cannot legally be sold except to physicians, or under the prescription of a physician." Restatement (Second) of Torts § 402A cmt. k; *see also De Bouse*, 922 N.E.2d at 318. The physician's job is to balance the product's benefits with its risks for individual patients:

---

[11] One difference is that, unlike the general risk-utility test, comment k applies regardless of the existence of feasible alternative designs. *Compare Glassman*, 606 N.E.2d at 342, *with Mikolajczyk*, 901 N.E.2d at 347.

> As a medical expert, the prescribing physician can take into account the propensities of the drug as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, [an] individualized medical judgment bottomed on a knowledge of both patient and palliative.

*Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 392 (Ill. 1987)

(quotations omitted).

Comment k is also grounded in the policy judgment that prescription drugs and devices should be widely available because they "can save lives and reduce pain and suffering." *Brown v. Superior Court*, 751 P.2d 470, 479 (Cal. 1988); *see also Tansy v. Dacomed Corp.*, 890 P.2d 881, 885 (Okla. 1994). The Illinois Supreme Court "is acutely aware of the social desirability of encouraging the research and development of beneficial drugs" and is "equally aware that risks, often grave, may accompany the introduction of these drugs into the marketplace." *Woodill v. Parke Davis & Co.*, 402 N.E.2d 194, 199-200 (Ill. 1980). That is, "[d]espite inherent risks, *and in contrast to any other product*, society has determined that prescription [-only products] provide a unique benefit and so should be available to physicians with appropriate warnings and guidance as to use." *Grundberg*, 813 P.2d at 96 (emphasis in original).

By shielding a product within its scope from design-defect liability, comment k keeps the focus of a product-liability action involving a prescription-only product on what it should be: whether the physician was able to make an informed decision about its use. Comment k thus "denies plaintiffs one potential theory on which to rely in a drug products liability action" (i.e., defective design) but leaves open other "avenues of recovery" (i.e., inadequate warning and manufacturing defect). *Grundberg*, 813 P.2d at 99; *see also Transue v. Aesthetech Corp.*, 341 F.3d 911, 916 (9th Cir. 2003) ("[T]he rationale ... for providing comment *k* immunity for medical devices and products ... emphasizes the presence of physicians as intermediaries between manufacturers and consumers ...."); *De Bouse*, 922 N.E.2d at 318.

In this way, comment k preserves the vital role physicians play in setting standards of care and selecting patient-specific treatments and ensures that lawyers and juries do not force off the market a product that trained physicians, in the exercise of their medical judgment, believe to be the best treatment option available. *See* JA2432, JA2458 (Dr. Byrkit noting "there are not a lot of options" for treating SUI and that TVT-O "was the best thing that [she] could offer" Mrs. Huskey). It thus answers in the negative the district court's incisive question on this point: "How can use of

- 42 -

a device meet the standard of care and still be unreasonably dangerous?" JA3309. It cannot.

The district court's decision eliminating the comment k inquiry in favor of the risk-utility test was not only wrong, it also created substantial inconsistencies in Illinois law. For instance, in Illinois, comment k is an exception to the unreasonable-dangerousness doctrine. *De Bouse*, 922 N.E.2d at 317. The district court rendered this exception a nullity, concluding that the rule and its exception were coextensive. Similarly, Illinois treats comment k as an affirmative defense. *Glassman*, 606 N.E.2d at 342. But under the district court's reasoning, this defense is self-defeating—its only function is to flip the burden of proof from the plaintiff to the defendant. JA4561.

Federal diversity courts should eschew novel interpretations of state law, particularly those that expand liability. *See Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004). This command has all the more force where, as here, that novel construction renders state law irrational. The district court failed to appreciate that comment k provides special protection for prescription medical products like TVT-O. Had it done so, and had it

applied settled Illinois law, it could only have concluded that Plaintiffs'
design-defect claim was barred as a matter of law.

### B.    TVT-O Comes Within Comment k's Protection.

TVT-O satisfies all of comment k's conditions. TVT-O is a socially
useful and desirable product that "serve[s] the salutary purpose[] of
restoring a degree of normalcy to the lives of those who suffer organic
dysfunctions and an impaired quality of life." *Tansy,* 890 P.2d at 885
(quotations omitted); *Glassman*, 606 N.E.2d at 342-43 (oral contraceptives are
socially useful because they are a "convenient and effective form of birth
control"). The effects of SUI can be "devastating" and life altering, JA3451,
to say nothing of the fact that "women find it very embarrassing."
JA3371-72; *see also* JA2761-62 (Mrs. Huskey explained that her SUI was
"very disturbing" and she had a "horrible feeling" after one episode);
JA2703. For these reasons, the medical community accepts that even major
abdominal surgeries may be warranted to treat this serious condition.
JA3453; *see also* JA2308-09, JA2317.

Midurethral slings like TVT-O largely replaced invasive surgeries for
SUI, becoming the most common SUI surgical procedure in the United
States and the developed world. JA2298, JA2308, JA2949, JA2963. The vast

majority of the medical community considers TVT-O and similar midurethral slings to be a major improvement over these more-invasive procedures. JA2311 (midurethral sling procedures are "probably the most important advancement in the treatment of [SUI] in the last 50 years"); *see* JA3051 (transobturator slings like TVT-O are the gold standard for SUI surgery); *see also supra* at 6-8. TVT-O is undoubtedly a useful and desirable product within the meaning of comment k. *See Chambers v. G.D. Searle & Co.*, 441 F. Supp. 377, 380-81 (D. Md. 1975), *aff'd*, 567 F.2d 269 (4th Cir. 1977) (comment k applies to oral contraceptives); *see also Transue*, 341 F.3d at 916-17 (breast implants); *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1337 (9th Cir. 1985) (intrauterine devices); *Tansy*, 890 P.2d at 885 (penile implants).

TVT-O's risks are unavoidable. As the American Urological Association explains: "many sling-related complications are not unique to mesh surgeries and are known to occur with non-mesh sling procedures as well." JA4289, JA4363; *see also* JA2299, JA2969. These unavoidable risks include chronic pain and dyspareunia, *see, e.g.*, JA2443-44, JA2497-98, JA2505-06, JA3467-68, JA3481-83, JA3488, which are present even with the procedures preferred by Plaintiffs' experts, *see* JA2344, JA2347-48, JA3074,

- 45 -

JA3481-83, JA3488.[12] And although TVT-O also carries a risk of mesh erosion, that risk unavoidably attends all synthetic-mesh procedures, *see, e.g.*, JA2501, JA2504-05, JA2444, JA3479-81, and is readily accepted by physicians given the benefits of synthetic mesh,[13] *see, e.g.*, JA2949 (ninety-nine percent of members of AUGS use midurethral slings like TVT-O to treat SUI).

Finally, TVT-O is more than an apparently reasonable means to treat SUI. To show that a device is a reasonable means of treatment, a defendant need not prove that the product's utility outweighs its risks for all patients. *See De Bouse*, 922 N.E.2d at 318 ("A drug manufacturer cannot say with

---

[12] *See also* JA1592-93 (FDA observing that every complication sustained by Mrs. Huskey, "[w]ith the exception of mesh erosion, ... can occur following a non-mesh surgical repair for SUI") (excluded by district court's ban on all FDA-related evidence).

[13] Physicians accept the risk of erosion because synthetic mesh has lower complication rates than comparable non-mesh procedures, *see, e.g.*, JA2300 ("synthetic slings are an appropriate treatment choice for women with stress [incontinence], with similar efficacy but less morbidity than conventional non-mesh sling techniques"), and because erosions are both rare and treatable. JA2476, JA2707; *see* JA2351 (Dr. Rosenzweig's "two to three" TVT and TVT-O patients who had erosions were treated and resolved to his satisfaction); JA2891 (Dr. Blaivas agreeing that mesh exposure "can almost always be successfully managed surgically" and that pain and dyspareunia are completely resolved half the time).

complete certainty that its product, when used as intended, will be reasonably safe for all patients."); *Woodbury v. Janssen Pharmaceutica, Inc.*, 1997 WL 201571, at *6 (N.D. Ill. Apr. 10, 1997) ("[U]nder Illinois law, a drug is not unreasonably dangerous merely because it should not be used for *some* purposes." (emphasis in original)). Rather, a defendant need only show that the product should "not [be] taken off the market." *Woodbury*, 1997 WL 201571, at *6; *see also Kunnemann v. Janssen Pharmaceutica Prods., L.P.*, 2008 WL 5101116, at *13 (N.D. Ill. Dec. 2, 2008) (product not unreasonably dangerous because experts agreed that it was a "useful and desirable drug for dealing with chronic pain").

TVT-O is most assuredly such a product. TVT-O is "safe and effective and has improved the quality of life for millions of women." JA3511-13 (referring to conclusion of physicians' organizations).[14] Nor is it a surprise that, as the district court observed, the testimony "from all of the medical

---

[14] *See also supra* at 6-8 (discussing approval by NICE, International Urogynecological Association, AUGS, and SUFU); *see* JA2309-10 (AUGS and SUFU state that transobturator slings (of which TVT-O is one) are "safe and effective relative to other treatment options and remain the leading treatment option and current gold standard for stress [incontinence] surgery"); JA2315-16 (TVT-O is supported by "high quality evidence of efficacy and safety").

witnesses [was] that the use of the TVT-O by urologists and other qualified physicians for the treatment of stress urinary incontinence meets the standard of care." JA3309.[15] For all these reasons, comment k defeats Plaintiffs' design-defect claim.

### C. Plaintiffs Failed to Prove that a Specific Defect in TVT-O Caused Mrs. Huskey's Injuries.

Plaintiffs' design-defect claim fails for the additional reason that Plaintiffs did not adduce competent evidence establishing a causal link between a defect in TVT-O and Mrs. Huskey's injuries. To prevail on a design-defect claim, a "plaintiff must show that [her] injuries derive from a *distinct defect* in the product which subjects those exposed to the product to an unreasonable risk of harm." *Kokoyachuck v. Aeroquip Corp.*, 526 N.E.2d 607, 609 (Ill. App. 1988) (emphasis added); *accord Lewis*, 601 F. App'x at 211-12. Proof of causation involves complex biomedical issues, and is

---

[15] Plaintiffs' experts did not dispute that a physician's choice to use TVT-O satisfies the standard of care. Instead, they disagreed that physicians should be allowed to exercise that choice, rejecting the informed judgment of the medical community and extensive clinical data demonstrating TVT-O's safety. JA2301-18 (Dr. Rosenzweig); JA2946-71 (Dr. Blaivas disagreeing even with a position statement by the American Urological Association of which he is a member). But a hired expert should not be permitted to "second-guess an entire profession." *Osborn v. Irwin Mem. Blood Bank*, 5 Cal. App. 4th 234, 276 (Cal. App. 1992).

satisfied only with expert testimony. *See Lewis*, 601 F. App'x at 211-12; *cf. Henry v. Panasonic Factory Automation Co.*, 917 N.E.2d 1086, 1091-92 (Ill. App. 2009) (expert testimony necessary to establish breach in design-defect claim).

The district court submitted the claim to the jury based on the testimony of Dr. Blaivas, the only expert Plaintiffs offered on specific causation. JA4567. But Dr. Blaivas never linked Mrs. Huskey's condition to a distinct defect in TVT-O, as the district court appeared to acknowledge. *Id.* (noting that "Dr. Blaivas did not directly state that" a specific defect "proximately caused Mrs. Huskey's chronic inflammation and pain"). Dr. Blaivas testified that other than Mrs. Huskey's mesh in general, he was unaware "of anything else that can cause ... this particular constellation of symptoms." JA2893. Similarly, he opined that "the mesh" caused Mrs. Huskey's scarring and complaints of pain. JA2880-82 (district court clarifying "that it was the mesh" that Dr. Blaivas believed caused Mrs. Huskey's injuries).

This testimony was insufficient to establish a jury question on causation. Dr. Blaivas was required to identify "what characteristic of the [TVT-O], defective or not, caused [Mrs. Huskey's] pain." *Lewis*, 601 F. App'x

at 211. He did no such thing. At most, his testimony established that complications from TVT-O caused her injuries, not that a *defect* in TVT-O caused her injuries. *Id.* (affirming directed verdict because expert "testified that the 'presence' of the TVT caused Lewis's pain, but did not testify that a *defect* in the TVT caused her pain" (emphasis in original)); *see also Laro v. Thoro-Matic Vacuum Sys., Inc.*, 551 N.E.2d 390, 392 (Ill. App. 1990) ("injuries are not compensable if they are caused by inherent propensities of a product" known to users); *Johnson & Johnson v. Batiste*, 2015 WL 6751063, at *5 (Tex. App. Nov. 5, 2015) (expert's testimony "essentially stat[ing] the pain results from the sling" insufficient to establish specific causation because it did "not tie [the plaintiff's] pelvic pain to" any alleged defect in TVT-O).

## III.    Defendants Are Entitled to Judgment on Plaintiffs' Negligence Claim and Mr. Huskey's Loss-of-Consortium Claim.

Because the negligence claim was based on the same facts and duties as the two strict-liability claims, it too must fail. *See Apperson v. E.I. du Pont de Nemours & Co.*, 41 F.3d 1103, 1108 (7th Cir. 1994) (applying Illinois law and affirming judgment on negligence claim where strict-liability claim failed, since "the elements of negligence and of strict liability do not differ in

any sense relevant here"); *see also Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1154-55, 1157-59 (Ill. 2011); *Phillips v. U.S. Waco Corp.*, 516 N.E.2d 670, 674 (Ill. App. 1987). Likewise, because the duty to design a reasonably safe product is identical under negligence and strict-liability theories, *see Jablonski*, 955 N.E.2d at 1154-55, comment k applies equally to Plaintiffs' negligent-design claim. *See Ackley v. Wyeth Labs.*, 919 F.2d 397, 404 (6th Cir. 1990) (Ohio law).

Mr. Huskey's loss-of-consortium claim is "equally untenable" because all of Mrs. Huskey's claims are without merit. *Bitner v. Pekin Mem. Hosp.*, 741 N.E.2d 1075, 1077 (Ill. App. 2000).

## IV. At a Minimum, the District Court's Errors Require a New Trial.

This case should never have gone to a jury. But once it did, two critically prejudicial errors prevented the jury from considering all relevant and admissible evidence and applying the law to it. First, the district court barred *all* FDA evidence—even published guidance directly addressing the device's safety and efficacy—in a trial about an FDA-regulated medical device. Second, the court compounded its erroneous interpretation of comment k by refusing even to instruct the jury on its requirements.

## A.    The District Court Erroneously Excluded All FDA Evidence.

The district court's exclusion of all FDA evidence—accompanied by its threat of "very large" sanctions if those letters appeared even accidentally, JA3187—was an abuse of discretion, leaving a glaring hole in the trial record that can be corrected only by a new trial. *See Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 305 (4th Cir. 1984) (error not harmless when court could not "be certain" that exclusion of evidence did not affect outcome). For the reasons that follow, both the district court's legal conclusion that TVT-O's regulatory history had "little relevance," JA4582, and its finding that FDA evidence should be excluded under Rule 403, JA4583-84, were erroneous and prejudicial. Moreover, when the district court held that "going down the road of federal regulatory schemes" would "risk confusing and misleading the jury," JA4584, it not only erred but wholly failed to address the breadth of its exclusionary order or the order's impact on Defendants' ability to rebut Plaintiffs' allegations.

### 1.    Defendants' FDA Evidence Was Highly Probative.

Defendants sought to offer regulatory evidence attesting directly to TVT-O's safety. This evidence went far beyond the mere fact of FDA clearance considered in *Cisson.*

Defendants sought to inform the jury that FDA undertook careful scrutiny of mesh devices like TVT-O and confirmed their safety and efficacy for treating SUI. Specifically, in 2011, FDA held a two-day meeting with its Obstetrics and Gynecology Devices Advisory Committee concerning all pelvic-mesh products. JA782. In preparation for that meeting, "FDA systematically evaluated the peer-reviewed scientific literature to revisit the fundamental question of the safety and effectiveness of surgical mesh for urogynecologic indications" and determined that "[a] substantial number of quality clinical trials, as well as systematic reviews, have been published for the first generation minimally invasive slings that provide evidence of safety and effectiveness." JA1513, JA1532. The Committee's "consensus was that the safety and effectiveness of these devices is well-established." JA1589.

In March 2013, FDA reiterated these conclusions in published guidance on the treatment of SUI. It stated that the "safety and effectiveness of multi-incision slings is well-established in clinical trials that followed patients for up to one-year" and that "[l]onger follow-up data is available in the literature." JA1592. FDA further noted that "all surgeries for SUI carry"

risks, including those sustained by Mrs. Huskey, and the risks associated with mesh slings are not unique to any "single brand of mesh." *Id.*

Likewise the earlier regulatory history specific to TVT-O went directly to its safety and efficacy. This stands in stark contrast to regulatory history of the device at issue in *Medtronic, Inc. v. Lohr*, the principal precedent cited in *Cisson*. In *Cisson*, this Court upheld the district court's decision to exclude, under Rule 403, evidence that FDA had cleared the Avaulta Plus, a different mesh device used to treat pelvic organ prolapse, a different condition. The Court reasoned that the district court could permissibly conclude that the potential for prejudice and confusion from such evidence outweighed its potential probative value because the 510(k) process was not designed to evaluate a device's safety and efficacy and the admission of such evidence would require a "mini-trial" on Section 510(k). 2016 WL 158814, at *3-5.

The *Cisson* court relied almost exclusively on *Lohr* for its conclusion that 510(k) evidence was of minimal probative value. As the decision explained: "The entire analysis [in *Lohr*] turned on the Court's finding that '§ 510(k) exemption process was intended to … maintain the status quo with respect to the marketing of existing medical devices and their

- 54 -

substantial equivalents,' not impose new regulatory requirements on

devices." 2016 WL 158814, at *4 (quoting *Lohr*, 518 U.S. at 494). That was

true in *Lohr* because the device at issue was "grandfathered" into 510(k)

clearance. 518 U.S. at 478 & n.3.[16] That is, the device secured 510(k)

clearance based on its substantial equivalence to a product that was *never*

"formally reviewed … for safety and efficacy." *Id*. at 493.[17]

───────────────

[16] The device in *Lohr* was cleared in 1982, but Congress thereafter changed the § 510(k) process to make it more rigorous. In 1990, Congress passed the Safe Medical Devices Act, which "essentially rewrote the 510(k) process" to "impose[] more safety and effectiveness requirements on 510(k) medical devices." Ralph F. Hall & Michelle Mercer, *Rethinking* Lohr: *Does "SE" Mean Safe and Effective, Substantially Equivalent, or Both?*, 13 Minn. J.L. Sci. & Tech. 737, 748 (2012); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349-50 (2001) ("510(k) process" is designed to "ensure ... that medical devices are reasonably safe and effective.").

[17] Defendants respectfully disagree with the Court's ruling in *Cisson* to the extent it would support the district court's decision to bar 510(k) evidence here. *Cisson*'s evaluation of the 510(k) process was based on *Lohr*, but that decision is inapposite, at least as it applies to a device like TVT-O, which did not receive its clearance via "grandfathering." *Cisson* also dismisses FDA's numerous statements that it evaluates a device's safety and efficacy when undertaking 510(k) review. 2016 WL 158814, at *4; *see also, e.g.*, JA614 (although "the 510(k) review standard is comparative ... principles of safety and effectiveness underlie the substantial equivalence determination in *every* 510(k) review." (emphasis added)). But these statements are real-world evidence that FDA does in fact use the 510(k) process to review a device's safety and efficacy and they "reflect a body of experience and informed judgment to which courts and litigants may

- 55 -

But the regulatory history here is vastly different. TVT-O did not obtain its clearance based on "grandfathering," but after significant consideration of safety and efficacy in multiple regulatory contexts. TVT-O is composed of polymeric mesh knitted from filaments of the same polypropylene material contained in Ethicon's Prolene suture, approved by the FDA in 1969 under its rigorous New Drug Application process.[18] That process is substantially similar to the current premarket approval process for Class III devices under the MDA, JA772-75, which imposes robust device-specific requirements "focused on safety." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 322-23 (2008).

---

properly resort for guidance." *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (quotations omitted).

[18] At the time the Prolene suture was approved, FDA regulated drugs and devices under the same framework. After approval of Prolene suture, with the passage of the MDA in 1976, Congress instituted a separate regulatory framework for devices. Under the MDA framework, devices receive one of three classifications based on the risk posed. *See* 21 U.S.C. § 360c(a)(1)(A)-(C). Class I devices are considered low risk and are subject to "general controls." § 360c(a)(1)(A). Most devices are Class II, meaning they pose a greater risk of harm and must pass through FDA's 510(k) process before they may be marketed. *Talley v. Danek Med., Inc.*, 179 F.3d 154, 160 (4th Cir. 1999) (citing § 360c(a)(1)(B)). Class III devices pose the greatest risk of harm, and thus require "premarket approval" (PMA) by the FDA. § 360c(a)(1)(C).

In fact, by operation of the MDA, Prolene (a "transitional device") was initially approved as a Class III device. JA777; *see also* 21 U.S.C. § 360j(*l*)(1). And among other relevant aspects of the process, when FDA approved the Prolene suture and its label, it reviewed the issue of degradation and rejected the proposition that degradation presented a clinically significant risk, if it even occurred at all. *See* JA1122-28 (approving label stating Prolene is not "subject to degradation"); *see also* JA1201 (finding "degradation proceeds slowly and is generally not considered clinically significant under most circumstances").

When FDA first determined the proper regulatory classification for polymeric meshes under the MDA, three different FDA medical panels—gastroenterology/urology, plastic surgery, and orthopedics—evaluated their safety and effectiveness. The panels recommended that all polymeric mesh be placed in Class II, finding that it "has an established history of safe and effective use" and meets "a generally accepted satisfactory level of tissue compatibility." 47 Fed. Reg. 2810, 21 C.F.R. § 878.3300, Surgical mesh (Jan. 19, 1982). FDA subsequently agreed, finding that "the biocompatibility of the materials now being used in these devices has been established through their successful use for a number of

years." 53 Fed. Reg. 23,856, 23,861 (June 24, 1988). Soon after, following consideration by another advisory panel, FDA reclassified polymeric sutures as Class II devices, citing their long history of safe use. JA1195-1219. And in 2003 FDA adopted a guidance for surgical suture as a special control designed to provide additional "assurance of the safety and effectiveness" of these devices. 68 Fed. Reg. 32,983, 32,983 (June 3, 2003). This robust regulatory history shows that TVT-O's clearance rests on comprehensive consideration of the device's safety and efficacy, not simply concern with "whether the device is 'substantially equivalent to one that existed before 1976.'" *Cisson*, 2016 WL 158814, at *4 (quoting *Lohr*, 518 U.S. at 493-94).

It also shows this case to be wholly unlike *Lohr*. Under the MDA, pacemakers like that in *Lohr* were Class III devices, but the MDA included a "grandfathering provision" allowing pre-1976 devices to remain on the market until the FDA completed the PMA process. Certain *new* Class III devices could be marketed without going through the PMA process if they were "substantially equivalent" to pre-existing devices — "including a device grandfathered into the market." *Lohr v. Medtronic, Inc.*, 56 F.3d 1335, 1340 (11th Cir. 1995) (citing 21 U.S.C. § 360e(b)(1)(B)), *overruled by Lohr*, 518 U.S. 470. The Model 4011 pacemaker lead in *Lohr* "entered the market

through the 510(k) process as the substantial equivalent of a device grandfathered into the Act." *Id*.

The district court thus erred as a matter of law when it equated this case to *Lohr*, which involved a different statutory provision, no medical panel review, no regulatory classification decision, and no special controls or other FDA guidance, just "grandfathering." *See Food and Drug Administration v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 142 (2000) (statute designed to ensure that any regulated product "must be safe for its intended use"). So too equating TVT-O to the Avaulta Plus device in *Cisson* would be erroneous. The Avaulta Plus, which treated a different condition, was not made from the Prolene suture approved through FDA's NDA process and was not included within the group of devices FDA found safe and effective following its 2011 Advisory Committee review. To the contrary, the Committee concluded that additional study was necessary to determine the safety and efficacy of the Avaulta Plus and other devices for treating pelvic organ prolapse. *See* JA1587.

The regulatory history underlying TVT-O's 510(k) clearance shows that the Court's conclusion in *Cisson* about the Avaulta Plus's 510(k) clearance—that it "does not say very much that is specific," 2016 WL

- 59 -

158814, at *5 — is wholly inapplicable here. TVT-O's regulatory history demands a different result than to simply "say so again today." *Id*. But even if the Court were to find that *Cisson* compels it to uphold the district court's exclusion of evidence of TVT-O's 510(k) clearance (and it should not), the exclusionary order here was far broader. It barred "all" regulatory evidence, including FDA's recent comprehensive evaluation of TVT-O and other midurethral slings *for the purpose of* answering "the fundamental question of the safety and effectiveness." JA1513; *see also* JA1592 (FDA convened its advisory committee "*to … evaluate th[e] safety and effectiveness*" of surgical mesh slings for SUI (emphasis added)). This evidence was highly probative of every claim in dispute.

For instance, FDA's conclusion that transobturator slings like TVT-O are safe and effective was directly relevant to Defendants' contention that TVT-O was a socially desirable product with unavoidable but acceptable risks. FDA's conclusions that "all surgeries for SUI carry" risks and that the risks associated with surgical mesh were not unique to any one brand were likewise strong proof that TVT-O was unavoidably unsafe within the meaning of comment k. FDA's finding that Prolene does not pose a clinically significant risk of degradation undercut Plaintiffs' theories that

TVT-O's label was inaccurate and the device was defectively designed because its mesh degraded. And FDA's 2013 statement made clear that every risk allegedly sustained by Mrs. Huskey was well known to the medical community, thus foreclosing her warning claim. Barring FDA evidence that expressly and undeniably addresses the device's safety and efficacy and that was probative of the claims and defenses at issue was an abuse of discretion.

### 2. The District Court's Erroneous Rulings Severely Prejudiced Defendants and a New Trial is Warranted.

Rule 403 "favor[s] admissibility," *Cisson*, 2016 WL 158814, at *3 (quotations omitted), and Defendants' highly probative evidence should have been admitted.[19] Evidence should be excluded for "unfair prejudice" under Rule 403 only where "there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Westfield Ins. Co. v. Harris*, 134 F.3d 608, 613 (4th Cir. 1998) (quoting *Morgan v. Foretich*,

---

[19] *See Strum v. Depuy Orthopaedics, Inc.*, 2013 WL 3184765, at *1 (Ill. Cir. Mar. 8, 2013) (denying motion in limine "to exclude all references to the Food and Drug Administration"); *see also Musgrave v. Breg, Inc.*, 2011 WL 4620767, at *3 (S.D. Ohio Oct. 3, 2011) (rejecting motion to exclude, which would have prevented the jury from hearing all FDA-related evidence).

846 F.2d 941, 945 (4th Cir. 1988)); *see also United States v. Powers*, 59 F.3d 1460, 1467 (4th Cir. 1995). The evidence here was highly probative, and it cannot be said that a jury would have been "excited to irrational behavior" by learning of the FDA's conclusions about the safety and efficacy of TVT-O. Rather, denying the jury the opportunity to consider FDA evidence risked the opposite: that the jury would reach a verdict failing to account for evidence that went directly to Plaintiffs' core contentions.

FDA regulation is a fact of life for drug and device manufacturers, and FDA's role in the oversight of prescription products is a matter of common knowledge. *See* JA1602 (*Strum*) ("[E]verybody in this jury is going to say what did the FDA say about this because that's the world we live in. They want to know."). The district court's outright prohibition of any mention of FDA prevented Defendants from satisfying "the jurors' expectations about what proper proof should be," *Old Chief v. United States*, 519 U.S. 172, 188 (1997), and "left [the jury] wondering" whether Defendants had satisfied even their most basic obligations, *United States v. Pegues*, 493 F. App'x 396, 400 (4th Cir. 2012).

Worse still, the court's rulings prevented Defendants "from fully developing evidence relevant to" key elements of their defense, *Schultz v.*

- 62 -

*Butcher*, 24 F.3d 626, 632 (4th Cir. 1994), and denied Defendants the ability to undercut core aspects of Plaintiffs' case. One of Plaintiffs' main themes to the jury was that Ethicon should be held liable for not performing clinical trials before marketing TVT-O. *See* JA3846 (closing argument). Yet Defendants were barred from explaining that FDA did not require clinical trials to market TVT-O, *see e.g.*, 21 U.S.C. § 360c(a)(1)(B); JA1549.

In fact, Defendants were prohibited from informing the jury that in its 2011 review of surgical mesh, FDA expressly considered whether pre- or post-market clinical studies were necessary for transobturator slings, JA1549-50, and, citing its "consensus ... that the safety and effectiveness of these devices is well-established," FDA's advisory panel determined that neither "premarket clinical studies" nor "postmarket studies" were necessary. JA1589. Likewise, while Plaintiffs argued to the jury that TVT-O had been "rushed to market," JA3846 (closing argument), Defendants were prevented from answering this accusation by explaining TVT-O's robust regulatory history, including that Ethicon marketed the device only after FDA had approved the Prolene suture and cleared TVT, TVT-O's predicate device.

The district court's rulings also prevented Defendants from rebutting Plaintiffs' theory that TVT-O's mesh was subject to degradation. While Dr. Rosenzweig testified that the mesh "can degrade," JA2238, and Plaintiffs' counsel argued to the jury that Defendants "know that it degrades," JA3875, Defendants were barred from showing that when FDA approved the Prolene suture and its label in 1969, it reviewed the issue of degradation and determined that Plaintiffs' theory was unfounded. *See* JA1122-30 (approving label stating Prolene is not "subject to degradation"); *see also* JA1201 (finding "degradation proceeds slowly and is generally not considered clinically significant under most circumstances"). Further, the district court's ruling prevented Defendants from explaining that consistent with that determination, the degradation language used in TVT-O's label tracks the FDA-approved degradation language for Prolene suture.

Finally, Plaintiffs were permitted to bolster their design-defect claim with Dr. Rosenzweig's blunt testimony that TVT-O "is unsuitable for implantation." JA2240. Defendants, by contrast, were precluded from explaining that this was the exact opposite of the conclusion reached by FDA and the expert advisory committee specifically empaneled to scrutinize the safety and effectiveness of midurethral slings.

This prejudice to Defendants cannot be justified by concern over juror confusion, as the *Cisson* court said was the case with the 510(k) clearance evidence it addressed. The *Cisson* court believed that evidence would have required the jury first to determine how much information 510(k) clearance provided about "the safety of the underlying product." 2016 WL 158814, at *4-5. There is no room for jury debate here, however, because Defendants' evidence unquestionably spoke to TVT-O's safety and efficacy—indeed, a substantial portion of Defendants' evidence *was that* FDA concluded that TVT-O and similar slings were safe and effective. If anything, what posed a much greater risk of misleading the jury was the blanket prohibition of regulatory evidence in a trial concerning a product that could be marketed *only* with FDA's permission.[20]

In short, the district court's blanket exclusion of all FDA-related evidence was unjustified and thwarted Defendants' ability to rebut

---

[20] To the extent there was a minimal risk of confusion, it would easily have been "alleviated" by a simple jury instruction. *Deans v. CSX Transp. Inc.*, 216 F.3d 398, 401 (4th Cir. 2000); *see also Moehle v. Chrysler Motors Co.*, 443 N.E.2d 575, 578 (Ill. 1982) ("With careful instructions to the jury by the trial judge and effective argument by plaintiff's counsel we believe that the jury can properly evaluate the importance of safety-standard evidence and then weigh it with all of the other evidence in the record.").

Plaintiffs' contentions at every turn. A new trial is necessary to correct this error.

## B. At the Least, the District Court's Refusal to Instruct the Jury on Comment k Entitles Defendants to a New Trial.

Plaintiffs' design-defect claim should never have gone to the jury at all. But when it did, the district court erred by refusing even to instruct the jury on comment k, JA4059 (Defendants' proposed instruction), and at minimum a new trial is required. *See Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (new trial warranted where the requested instruction: "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the party's ability to make its case" (quotations omitted)).

There is no doubt that the evidence supported a charge to the jury regarding comment k. *See Sloas v. CSX Transp. Inc.*, 616 F.3d 380, 392 (4th Cir. 2010) (defendant entitled to jury instruction if there is any evidence in support of its defense). And Plaintiffs did not argue that Defendants' proposed instruction was incorrect, nor could they—it accurately stated the

law. Rather, the district court rejected Defendants' instruction based on the legally incorrect conclusion that comment k is inoperative in Illinois.

The district court erred. As shown above, comment k is a vital and independent part of Illinois law that provides special protection for prescription medical products, including TVT-O, due to their unique social value and the presence of physicians as learned intermediaries. *See supra* at 37-48. Thus the district court's charge—which informed the jury only that "[a] product is unreasonably dangerous when the risk of danger inherent in the design outweighs the benefits of the design when the product is put to" its reasonably foreseeable use, JA3927—was woefully incomplete.

The district court's error "seriously impaired [Defendants'] ability to make [their] case." *Noel*, 641 F.3d at 586 (quotations omitted). Courts in Illinois and elsewhere hold that a refusal to instruct the jury on comment k, or the exclusion of evidence bearing on that defense, necessitates a new trial. *Mele v. Howmedica, Inc.*, 808 N.E.2d 1026, 1042 (Ill. App. 2004) (exclusion of evidence); *Ortho Pharm. Corp. v. Heath*, 722 P.2d 410, 415-16 (Colo. 1986), *abrogated in part on other grounds by Armentrout v. FMC Corp.*, 842 P.2d 175 (Colo. 1992) (jury instruction). Equally, courts hold that a jury is properly instructed where it receives a comment k instruction. *See Tobin v.*

*Astra Pharma. Prods., Inc.*, 993 F.2d 528, 540 (6th Cir. 1993); *Estates of Tobin by Tobin v. Smithkline Beecham Pharm.*, 164 F. Supp. 2d 1278, 1288-89 (D. Wy. 2001); *Breen v. Synthes-Stratec, Inc.*, 947 A.2d 383, 389 (Conn. App. 2008); *Tansy*, 890 P.2d at 887-88; *Burwell v. Am. Edwards Lab.*, 574 N.E.2d 1094, 1098 (Ohio App. 1989); *Davila v. Bodelson*, 704 P.2d 1119, 1127-28 (N.M. App. 1985).

What no other court has held, however, is that a legally correct and factually supported comment k instruction is unnecessary simply because the jury is instructed on general risk-utility balancing. JA4581. The risk-utility test does not include the policy rationale underlying comment k, which recognizes that unique protections for prescription medical products are warranted and that such products are available only if a licensed prescriber first determines that the benefits outweigh the risks for the patient in question. *See supra* at 39-44.

Judgment should be granted for Defendants on all claims, but even if the Court does not find Defendants entitled to judgment on the design-defect claim, the district court's refusal to instruct the jury on comment k entitles Defendants to a new trial.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court or, in the alternative, remand the case for a new trial.

Dated: February 3, 2016                    Respectfully submitted,

/s/ Charles C. Lifland
CHARLES C. LIFLAND
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, California 90071
(213) 430-6000

STEPHEN D. BRODY
DAVID K. ROBERTS
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 383-5300

CHRISTY D. JONES
BUTLER SNOW LLP
1020 Highland Colony Parkway
Suite 1400
Ridgeland, Mississippi 39157
(601) 985-4523

DAVID B. THOMAS
PHILIP J. COMBS
THOMAS COMBS & SPANN, PLLC
P.O. Box 3824
Charleston, West Virginia 25338
(304) 414-1800

*Counsel for Defendants-Appellants*
*Johnson & Johnson and Ethicon, Inc.*

## REQUEST FOR ORAL ARGUMENT

Defendants-Appellants Johnson & Johnson and Ethicon, Inc. respectfully request oral argument. Oral argument is warranted because this case involves significant questions of state and federal law, including questions concerning a federal diversity court's role in construing state law and the federal Food and Drug Administration's regulation of prescription-only pharmaceutical products under the Medical Device Amendments to the federal Food, Drug, and Cosmetic Act. Moreover, oral argument will aid this Court in considering the complex legal and biomedical issues presented by this appeal.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,760 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Book Antiqua 14-point font.

Dated: February 3, 2016          /s/ Charles C. Lifland
                                 Charles C. Lifland

## CERTIFICATE OF SERVICE

I hereby certify that, on this 3rd day of February, 2016, the foregoing was electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system, and counsel for Plaintiffs-Appellees will be served by the appellate CM/ECF system. Hard copies of the foregoing are being sent to the clerk by Federal Express this same date.


Dated: February 3, 2016          /s/ Charles C. Lifland
                                 Charles C. Lifland